v. Sage, 22244 and 22652. Thank you, Your Honor, and may it please the Court, Cal Barnett-Mayotte for Appellants Kenneth Pelletier and Michael Milchin. I'd like to reserve two minutes for rebuttal. Yes. Kenneth Pelletier and Michael Milchin live with cancer that the BOP has proven unable or unwilling to treat for years. They turn to the federal courts in pursuit... since this was decided by the district court. So I suppose that depends on what you mean by treatment, Your Honor. Mr. Pelletier has received surgery, and he's received a round of the radioactive iodine treatment that he requires. He requires ongoing intensive surveillance by his current doctors at Yale, and he, I have just learned from the government, has been moved this morning to a new facility. I don't know where. Mr. Milchin was moved a few days ago to FCI Fairton, where he now resides. And Mr. Milchin, has he had any treatment for... No, Your Honor. I'm sorry if I'm confusing the two. Mr. Milchin is the individual who has the skin cancers, and Mr. Pelletier had the growth on his neck. The thyroid. That's right, Your Honor. Okay. And also, since you mentioned the fact that both of these individuals have been moved from Danbury, I suppose we have this motion with respect to Mr. Milchin that the government asserts that the case is moot. Mr. Pelletier, there is not yet a motion, but there's going to be one. Is that what we understand? That's my understanding. Okay. Could you address that mootness issue? Because there are two problems, it seems to me. There is no claim here for damages, right? That's right. So there's no retrospective relief being sought for the previous failure, even assuming it was unconstitutional, to provide treatment. We are only dealing with prospective relief.  Now, again, I'm getting confused. Mr. Milchin is the one who's had the surgery and radiation.  Pelletier. So with respect to Mr. Pelletier, there's an argument that the case is moot because he has received the treatment, or at least such treatment as he's up to date with already. With respect to Mr. Milchin, and perhaps eventually Mr. Pelletier, there's a question that they are no longer under the jurisdiction of the person who was sued, and they are no longer in the institution as to which there is a record of insufficiency of response to their conditions. So why doesn't that moot our case? That's right, Your Honor. So I think there were a few questions in there, and I'll try to take them in turn, but please let me know if I missed anything. So as to Mr. Pelletier, there, of course, is an argument, and I expect the government to mount it, that his treatment moots his claim. His treatment is ongoing, and it continues to be significantly delayed. In fact, the BOP has acknowledged its inability to give him the radioactive iodine treatment that he needs in-house at any of its facilities. We mentioned this in our reply brief. They explain that his cancer treatment presents, quote, a major issue within this correctional environment because, quote, radiation and frequency of trips are unable to be accomplished here. That's not his surgery. This is his post-surgery care and surveillance. So there are serious ongoing issues. Of course, these are things that the district court will need to deal with on remand, but based on the allegations in this complaint and our understanding of the care, the claim is certainly still alive. I also want to emphasize that I think Your Honor is exactly correct to focus on their care in thinking about mootness and not simply the fact of transfer. My clients, as I've said, have alleged a view of that. Well, I was asking you to address both. Yes. Well, anyway, I think the question to Pelletier is that's exactly right. Now, the government has made no representation about their care. It's only said that transfer automatically moots conditions claims. But, of course, that's not true across the board. That's true as to your normal run-of-the-mill conditions claim that's isolated to the transferring facility. But here my clients raise the prospect of a BOP-wide failure and the transfer to— Well, but what is the basis for your saying that? Now, I understand what you just said about Mr. Pelletier that the—and here, you know, maybe we are in a situation where the facts need to be found. But at least your representation was that the Bureau of Prisons has acknowledged that it cannot provide adequate care anywhere, anyhow, because it can't guarantee that he will get the radiation treatment on a schedule that is appropriate, right? But with respect to Mr. Milchen and with respect to both of them in terms of what you referred to in your opposition to the motion, which is there are allegations in the complaint of systemic problems with the Bureau of Prisons— I mean, I just read it. That's COVID. It's all about COVID. Everything they say about the Bureau of Prisons is that the Bureau of Prisons has been failing to respond appropriately to COVID. There's not an allegation that I've been in another institution and they also neglected my cancer treatment, or even my cellmate tells me that he was in another institution and they failed. So what is the basis for saying that at Fairton they will be as neglectful as they were at Danbury in providing Mr. Milchen cancer treatment? A few responses, Your Honor. The first is that Mr. Pelletier was in fact housed at FMC Devins prior to his incarceration at FCI Danbury. That's when he first noticed a lump in his neck and he was housed there for a year and a half without getting the treatment he needed. Of course, FMC Devins is a federal medical center far better equipped than Danbury to treat his cancer. He mentions that at AA20 that he was previously incarcerated at a different facility. As for the COVID question— When you say he mentions that, what document is that that we're talking about? In the petition, he mentioned that he was at— In the original petition? That's right. Okay. The petition also explains, and this is a quote, this condition existed pre-COVID and continues to this date. That's AA17. This filing is not— But all it says is that he was evaluated and then apparently he was moved to Danbury. That's right, Your Honor. So he began— What are you asking us to draw from the fact that he was at this prior facility? I think it goes to the BOP-wide failings that this case alleges. In other words, a federal medical center, which, of course, is much better equipped than Danbury to handle serious medical needs, failed as well. Now, of course, this is a— It doesn't say failure. It says he was evaluated for a cystic mass. Yes, Your Honor. I think this is maybe where the pro se pleading standards come in. My clients, of course, were pro se below, and the court had an obligation to read their filings to raise the strongest arguments they suggest. That's a mandate that the district court, I think, disregarded left and right. And certainly my clients on remand would present more evidence of the system-wide failing. We're talking about just a 12B6 pleading standard here. I see my time has expired, but I would be happy to continue if you wish. I have a couple of questions, Judge LaRue. Yes, of course. I wonder if counsel can just tell us what the basic facts are. Where is Mr. Milchin and where is Mr. Pelletier? Yes, Your Honor. Mr. Milchin is now at FCI Fairton. He's in New Jersey. That's right. And Mr. Pelletier, I'm told about 15 minutes ago that he's en route to a new facility. I don't know where. Now, wait a minute. Does anyone, presumably the government, will tell us something about where he might be? Do we have any idea whether he's within the circuit? Again, let's just get the basic facts straight. I don't know, Your Honor. My short answer, however, is that it doesn't matter. So as the Supreme Court explained in Rumsfeld v. Padilla, jurisdiction attaches when a petition is filed in the proper district and naming the proper respondent, and transfer does not defeat that jurisdiction. That's exactly what we have here. My client's filed in the District of Connecticut naming the warden of FCI Danbury, and the government can't moot this case or eliminate jurisdiction simply by transferring them out of circuit. Are there any claims here other than for injunctive relief? No, Your Honor. I mean, I guess it depends on whether you consider release injunctive relief, but it's all forward-looking prospective release. That's the ultimate injunctive relief? Yes, Your Honor. Release, yeah. But you're not shooting damages, is that right? That's right. Okay, thank you. If there are no further questions, I'll reserve the remainder of my time for rebuttal. Okay, we'll hear from the governor. Good afternoon, Your Honors. May it please the Court. Assisting United States Attorney Nate Putnam for the respondent warden. I guess I'll begin by providing this Court some facts, which I'm eager to do. Kenneth Pelletier was transferred this morning. I found out about that this morning. His transfer, and let me say that both of these transfers have nothing to do with this case. The timing is purely coincidental. As we've set forth in our papers, Pelletier imported drugs into FCI Danbury. Ultimately, he became a medium security inmate. That's why he was inappropriate for FCI Danbury. That's what precipitated his transfer. It was on consent. Michael Milchin was transferred. These act dates are eluding me. April 23rd, I think, was around then. We got a lot of motions. Motions and withdrawn motions and reinstated motions. That's when I filed my motion. He was transferred because he became eligible for a camp style living that is not available to men at FCI Danbury. They do have a camp for women, which is not available to men. I talked with opposing counsel about that and asked whether he wanted to, because for programmatic reasons, he's really progressing in his development. He was eligible for this less restrictive housing or accommodations. Ultimately, that's why he was transferred. Again, it was on consent. Now, Michael Milchin, with respect to his medical. But it's not a form of home confinement. It's not home confinement, Your Honor. But just to bring the court up to speed on the medical care. And I do intend to file papers in response to the filing that we saw on Monday. Michael Milchin has basal cell carcinoma on his face. Twice now, BOP and the prison officials at FCI Danbury have tried to get him to have that cancer removed from his face. The first time was in July 2021. They brought him to a surgeon, and he declined the procedure, citing he's going to get it when he gets out of FCI Danbury. They ultimately opted to do a cream-based treatment. Really, that didn't work over time. And this passed. The date's eluding me. I believe it's February 12th, but it was Super Bowl Sunday. This last Super Bowl Sunday, they tried to bring him again to the surgeon to have his basal cell carcinoma removed. And he, again, refused the procedure, and he actually signed a medical refusal form. So prison officials have tried to give Michael Milchin the care he needs. He just has not accepted it. Mr. Pelletier, I know opposing counsel mentioned this radioactive iodine treatment. That completely happened. In fact, I believe he – that happened at FCI Danbury. This was a treatment where he actually was literally – I believe he was literally radioactive. So he had to be placed in, like, a part of the prison. I mean there was significant accommodations between prison officials at FCI Danbury and medical providers at Yale to figure out how to accommodate this. And they did it successfully. And my understanding is that he's done with that radioactive treatment. So that's where they are in their care. And to get back to the sort of legal issues on appeal here, you know, now that petitioners have withdrawn their claim for home confinement, we see this as extremely narrow. We think there's just two issues, one being mootness, the second being liberal construction. Why don't you address the mootness first? Yes, Your Honors. This court's presidents appear clear that where an inmate is transferred from a particular facility, their claims based on the conditions of confinement at that facility against – What happened to the other initial petitioners? They didn't appeal, but where are they? This is a putative class, right? Yes, Your Honor. I actually do have that information. Is that okay? Of course. You're not chained to the podium. Thank you. I've got last names. Matera, he was released from BOP custody on June 8, 2022. Eugene Castile is still at FCI Danbury. He's scheduled for relief based on First Step Act time credits in October of 2024. He has kidney disease, but according to prison officials, it's well managed at the moment. D. Martino is still at FMC Butner. He was transferred to FMC Butner, which is a prison hospital, to facilitate his higher care needs. He's scheduled for release via good time credits in September of 2026. I'm told – I have not reviewed these records myself, but I'm told that he is cancer-free at this point. There were at least alleged, as part of this settlement, widespread alleged problems with the medical care at this facility. And just with respect to the mootness, let me just ask you this. Do you think that there would be an exception to the mootness doctrine if, let's just hypothetically say, I know it's not this case, but if you had 20 inmates, 20 persons in prison, and each time one of those people complained or appealed, the government, with their consent, of course, because they want to get out of there, the government transferred them to another facility. Would that not be one of those circumstances which we would describe as capable of repetition, yet evading review, and therefore not mooting out the appeal? Yes, Your Honor. I do believe it would fall within one of the exceptions to mootness that are really designed to ensure that cases can't be frustrated. That's because there is a way, and I'm not suggesting that this is necessarily the case here, but one might not unreasonably view what's happening here as picking off the ones who appealed and transferring them while there is at least an alleged underlying continuing problem with medical care. Well, I don't, I guess I would disagree with that because, I mean, that is certainly not what the transfers here were about. I mean, we could have kept, for example, Michael Milchin at the facility, but we're not going to keep him in a more restrictive custody just to, you know, not fall within some sort of an exception to mootness. You know, our position, the other petitioners who are at FCI Danbury, they did not appeal. I think another thing that bears emphasis is that all of these petitioners at any time really have been able to go to the district court throughout this entire case, even this entire appeal, to seek whatever relief they wanted. And, you know, I mean, Judge Dooley's without prejudice dismissal in this case really was narrow. She basically concluded that home confinement wasn't legally available to the inmates, but the way we read her decision is really almost like an invitation to petitioners. I mean, she specifically said you could get other forms of relief. This gets to the merits, but just to keep on the mootness issue, I think the argument on the other side is that, and there is a pending motion, I believe, that's roughly related to this, is that we're really talking about a BOP-related condition not confined to a particular facility, FCI Danbury in this case. And I know that you're going to respond, but what's your response today to that? Well, our response is really that medical care. And I think in the court's precedence, actually, there's a big distinction in the prison transfer mootness context between facility-specific claims and more systematic claims, right? If we look at Thompson, that was one where he may have had two different types of claims. One was about the conditions at his Connecticut state prison facility that had a contract with federal prisons with the BOP. He was transferred to a BOP facility in Pennsylvania. The court found those claims mooted, but it kept alive claims that he had that were about disciplinary sanctions. And he was really challenging the fact that he was a high-security offender, right? So even in this court's precedence, there's this recognition of facility-based claims on the one hand and systematic claims on the other. And really the point I want to emphasize to the court is that medical care and access to medical care within the BOP system is fundamentally facility-specific. Each facility has different care levels. But you would agree, and I think you heard Judge Lynch's question to your friend on the other side, that the BOP-related set of allegations seem to be very specifically focused on COVID. But you would agree that if the complaint here had more broadly made allegations about BOP conditions generally, then the switching from one or transferring from one facility to another wouldn't moot out the case necessarily. Well, I think if an inmate was challenging a BOP policy, and I'm just on the fly coming up with a hypothetical. We're all on the fly. Yeah. Well, let's just say like a transgender inmate said, I would like gender-affirming care. And I don't think BOP's position is not to give that care, but we'll take it out of the BOP and some other prison system. I think if the policy was that we're not going to give you that gender-affirming care, then I would think that that would survive a transfer, right? That's a systematic issue. But the claims here really are specific to the institutions and the medical care. And even, I mean, most of the petition did talk about COVID, but some of it said understaffing, right? And there were allegations about, you know, the current wait times and the access to outside community care at FCI Danbury. Those things, like the nearby medical providers, right? The care level of the facility, the clinical director, the population. Hello? Judge, Judge Koubades. Can I interject a moment? Yeah. I know you're engaged in an extended meditation, which I appreciate, but let me just ask very basic questions about the state of the issue. First of all, I assume that you must be in touch often with counsel for the Bureau of Prisons. Is that right? Are you fully aware of what is happening prior to this action? Yes, Your Honor. I am in very close contact with the counsel for the Bureau of Prisons. Okay. Well, we've had some confusion about correspondence and motions flying around, which might have suggested otherwise. Is there any reason why the BOP shouldn't be made a party here? Shouldn't that make things a little easier procedurally instead of jumping around from one prison to another? Well, I have two responses to that. Number one, we have moved on mootness. I think if this case is moot because the conditions are different, it doesn't make sense adding a party. But fundamentally, if we do add the director of BOP, we do think there is a problem under ENDO. Ramshel V. Padilla, which set out the immediate custodian, the district of confinement rule. Typically, when you initiate a case, you file in the district of confinement. ENDO cuts out a very narrow exception to that. There's a few things that are notable. First of all, in the ENDO case, which was one in which a Japanese-American who was interned was moved from a facility in California to Utah. And the district court in California said, I'm retaining jurisdiction because there are officials within California in the war relocation authority who I can issue a writ to. And they can order that he be released. Right? Here, there's no indication that the director, Peters, is in the state of Connecticut. But I think more importantly, it's a much larger reach for petitioners. What they're asking is that Judge Dooley dictate the conditions of confinement. Let me ask you, what do you understand opposing counsel to be seeking from the Bureau of Prisons? What's your understanding of their case? What do they want? In their latest, our position is that their claims have really evolved over time. It's actually been, you know, for us, it's I think it's been hard to respond. But in their reply brief, I believe they said they want adequate medical care. Nothing more. Nothing less. Obviously, we cannot prove that they have adequate medical care until they return to district court. Throughout the pendency of this appeal, we have repeatedly tried to get them to do that. And we've explained that we do not need a ruling for this court. This court. And why is that not been possible? Why is that a problem? I don't understand. There's nothing that stops them from going to district court at any moment between. Wait, wait, wait. May I interrupt for one second, Judge Cabranes? Because I think there may be some confusion here. You're telling us that you have offered to take this case back to the district court? No. Let me be clear. No, Your Honor. What we have said is that Judge Dooley, our understanding of Judge Dooley's without prejudice dismissal, was simply that she said, look, you have sought specifically home confinement. I find that that is legally unavailable. And she said, but other forms of relief may be available to at least some members of the class. To us, that was an invitation for them to go back to district court to seek whatever relief they wanted. Maybe an amended complaint? Yes, an amended complaint. We have told them, if you go back with a new or amended complaint, there's nothing stopping them. And there would be no basis for us to say, you cannot go seek medical care from the district court. And you would be happy to do that, right? And you're prepared to go before Judge Dooley and work this out with the plaintiff's counsel? We're up to speed on the remaining members of this group. I'm a little concerned that we're spinning a lot of wheels here. And I'm not sure I fully understand what the situation on the ground is, and why it is that lawyers from each side can't simply discuss this matter and take it before the relevant district judge. Understood, Your Honor. So all my sentiments, we're talking about these two inmates. We have not talked about other inmates who are there. I mean, the BOP is obviously providing, you know, we provide everybody medical care. But these are the two inmates who appealed. Our view is that they should now go, that they're at different institutions, to their local district courts to seek whatever relief they want. Why not go back to Judge Dooley, who is familiar with this matter, and would be able to address your concerns, as well as the opposing side's concerns? Well, our view, I think there's two components. We think there's a jurisdictional problem with Judge Dooley prescribing the conditions of confinement at FCI Allenwood, where Pelletier is, and at SCI Fairton, where Milchin is. And then secondly, there's the mootness issue that we've raised, right, that these are habeas claims that are present forward-looking. So they're going to rise and fall on what access to medical care they have today. Access to medical care is fundamentally institution-specific. Our position is that we have been giving these to constitutional medical care. If they want to go to their local district court and challenge that, they're free to go. But they could also amend, we're spinning our wheels a little bit, but they could also amend and make broader challenges to BOP conditions in connection with medical care. I mean, that's part of the reason, I think, a small part of the reason that they want to add Director Peterson. If they, I mean, they're free to go to the district court to attempt to amend their complaint. I mean, they've never sought to amend their complaint. But if I could, Your Honor, there's actually a case, and we're going to file a reply to their opposition, but there was actually a case before Judge Dooley where it's kind of analogous here. It was one where an inmate who had cancer filed a 2241. They were at Danbury. They said, I have cancer. I need cancer treatment. And the BOP moved that inmate very shortly after the 2241 was filed to a prison hospital in Texas to receive treatment. I actually think the petitioner involved in that case, I think she got care and was actually back at SCI Danbury. But long story short, she was moved. And this exact issue came in front of Judge Dooley. This is a case called Beagle v. Easter, March 17th, 2021. I will file a reply with citing this case. And she addressed most of these issues. First of all, she did find that the transfer mooted the case because fundamentally there was no live controversy against the warden of SCI Danbury. The case would rise and fall on the conditions at the Texas facility. And then secondly, she noted that because the petitioners in that case tried to do exactly what petitioners are trying to do here. They tried to add in the director of BOP. I realize that there are important legal issues at stake with respect to the jurisdiction of the court and mootness and that you want to raise those issues. And I understand that there may well be systemic problems in the Bureau of Prisons and that someone might want to address that in some kind of properly founded lawsuit. But what we have here is two individual human beings who are suffering from potentially life-threatening maladies. Not necessarily. I don't want to overexaggerate. I know a fair amount from personal experience about skin cancers. But you never know what they are until you've taken them off and biopsied them. So there's a threat there. There's another fellow who's had, as of the time the briefs were filed, didn't seem to have a doctor saying he needs this surgery ASAP and it wasn't happening. Right? And maybe some of those things have been taken care of. And maybe Mr. Milchin has refused treatment, as you've suggested. But these are factual questions. And I would like to see the lawyers sort of stop worrying about all the ambitions to bring dramatic lawsuits and all of the technicalities of whether the warden or the commissioner is the appropriate defendant. And I'm not sure the commissioner is. I mean, the commissioner isn't personally responsible for what happened to these particular individuals and their particular institutions. And let's just get these people the treatment they need. Let's make sure it happens. And if it has happened, then that changes the mootness story from one that's this highly complicated set of technicalities about do we have the right defendant or do we have the right district court. And if we don't, is that really an avenue to the Bureau of Prisons sort of mooting all these cases by transferring people all over the country? Let's just see whether these people have gotten the appropriate treatment. And if they have, then we don't have a case anymore here. And great. And something has been accomplished by whatever, whether it's the filing of the lawsuit or the Bureau of Prisons getting on the stick and getting them treatment. But I take it there may be factual disputes about that, and I assume you're going to submit something on paper. And why can't we just work that out? And if we can't work it out, if there's a dispute about what the current conditions are, isn't that something that for this court to decide whether the case is moot because the plaintiffs now are receiving appropriate treatment, or at least the Bureau of Prisons has done what it can to give it to one of them and he's resisted, we can commission Judge Dooley as a special master to decide the factual issues relevant to the mootness motion and find out whether the people have gotten their treatment or not. And isn't that what God put us here to do, is to make sure that the sick are healed and not to argue about whether we can turn these two people's case into a class action that will govern the entire Bureau of Prisons' medical problems, or whether we have to worry about whether the Bureau of Prisons' transfer on these particular facts was abusive or not. If, in fact, they're getting their treatment, then why don't we find that out? Let me add my voice to Judge Lynch's comments, because I think it seems clear, at least to me, that the government's counsel is in position to help organize this case. That is, it's not that complicated. At a minimum, you can get before Judge Dooley and the two sides, along with the judge, can figure out what the best steps are going forward. We do not have to create a Big McGill here, and as Judge Lynch has suggested, although he speaks English, but I think that this is not that complicated. And it's the responsibility of the government, I would guess, as counsel for the Bureau of Prisons and for all of the possible parties, prisons, prison facilities, to organize the litigation itself. And that can be done very quickly. Alexander Graham Bell lived for a reason, and it will not be hard to do this. And I, for one, find it very frustrating to try to work through the interstices of this case, when it seems to be perfectly reasonable for the government and counsel to get together and work it out. And then, by the way, at worst, present us with substituted facts and arguably a proposed disposition. Now, Judge Lynch has very positively noted the possibility that it's necessary to ask Judge Dooley, without reaching large jurisdictional questions, we could ask Judge Dooley to serve as special master for this court, to organize this case and get it going. That's, I've said what I have to say on this. May I just briefly just respond, which I just want to make very clear to this court that the BOP's position is that they have been getting medical care. And, you know, we say to opposing counsel, and I have expressed this, that if they, you know, believe that they need any care at any time, they should contact me, they should file a petition. Throughout the pendency of this case, you know, we wanted to make clear we're not trying to make, you know, jurisdictional knots and keep things on appeal when we could just be in front of a district court. I think the sort of mootness issues that have arisen at the last minute have just naturally come from their transfers in the normal course of things that are unrelated to this appeal. But we have tried to go back to Judge Dooley, and we've talked to opposing counsel and said, look, she just said that you can't get home confinement, but you could file a petition to get anything else. And I do welcome settlement talks to try to resolve this just by figuring out what care has been given to them. Our position is we have been giving them care. As I noted, Michael Milton is not accepting the care, but I do understand the court's sentiments and respect that. And there are no further questions. Okay, I just have one related to the merits, which may by now have been totally superseded by the mootness stories. But it seemed to me, and I'm just going to say that I think the appellants have a good point, and I want to hear your response to it, that the issue of whether they can be released to home confinement, which is, of course, what these pro se individuals most wanted. That's what I would want if I was in prison. Whether that can be granted under the PLRA is a remedial question. And it's premature to address that question when you haven't even found that there is a violation to be remedied. And furthermore, that what their complaint asked for was release from home confinement, end such further relief as the court finds appropriate. And it seems to me that the government's position is aha, and the district court's position was aha. They said end further rather than or other. And if they had said or other, then the plaintiffs would be right that we can't reach the, we can't dismiss the complaint on the basis of the inability to grant home confinement. And I'm wondering how on earth construing a pro se complaint liberally to make the best claims that could be made is consistent with saying that the difference between or other and end further dooms this complaint. Yes, Your Honor. So let me address the sort of any further relief that the court deems necessary, right? I mean, when you look at the plain language of the petition, they repeatedly sought home confinement. We often see petitions just for home confinement. And they did put this language. Now, our view of this sort of language, any further relief, we see it. I mean, it's sort of language we see commonly in petitions that say other and further relief. In most answers, we see this language. And our view in defense of Judge Dooley is that this sort of language, in our opinion, is best read to seek other forms of relief that are related or attended to. Yeah, I hear it. I'm just saying, you know, again, you've got these people who have cancer. And, of course, they'd like to get treated out of prison because who wouldn't? But the problem is they have cancer. And the problem is they're saying the reason they want home confinement is they're saying the health care in the prison is inadequate. And, in fact, what the PLRA says is that you can't issue a release order unless all other avenues to give relief are tried and failed. So why don't we have to try and fail them? First of all, why don't we have to, in the first instance, figure out whether there is, in fact, any violation of the Eighth Amendment at all? And if we find that there is one, then there are some obvious things that could be done short of home confinement that would have to be tried before we even reach the issue of whether the district court needs to convene a three-judge court to grant home confinement. So that's why I've been puzzled. I was puzzled before we even got to the Moutonist case about what is essentially the same problem. Why aren't we focused on problem solving here? Why aren't we focused on making sure that these people do have appropriate care? And I understand the government says they are. That's fine. But why don't we just deal with that instead of engaging in this highly technical reading of the complaint in the first instance that says, aha, you can die of cancer. That will be fine because we can't give you home confinement, and that's what you asked for. Yes, Your Honor. But just in defense of Judge Dooley, you're noting that her interpretation of that line is highly technical. But I do think if you zoom out, there is absolutely no request for medical care in the petition, even though it doesn't take legal expertise to request that. And I think Judge— The facts that they allege are I have this medical condition, and it isn't being treated. And then it says, and therefore, send me home. Yes. And OK, fine. And the end, therefore, is highly problematic whether there's a PLRA or not as to whether that is the appropriate relief in light of the facts that they have set forth stating a violation of their—alleged violation of their constitutional rights. So that's why I just don't understand why we don't say, OK, well, they've alleged, maybe falsely, maybe inaccurately, that they aren't—that their serious health conditions are being deliberately disregarded. That's what they've alleged. There are obvious remedies for that if that is true. And home confinement may not be one of them. But I'm just troubled by the idea that the response to that complaint by anybody should be dismiss the complaint because all they asked for was home confinement, particularly when they have this catch-all, somewhat inartfully expressed phrase. But that's my question. Yes, Your Honor. I think you should have answered it. If I may briefly just respond to that. I mean one of the ways we conceptualize this is, like, imagine that they hadn't requested specifically home confinement or any plaintiff or petitioner files a case, makes all sorts of factual allegations and just say relief to be determined as the case proceeds, right, or any imaginable relief. We think under those circumstances a district court faced with such a pleading, either under Rule 8 or Rule 2, habeas rule 2, in either case, we think that would justify without prejudice dismissal where the court would say, look, the rules require you to state relief. Now, we understand petitioners— You were doing something that I think is helpful. You were both defending Judge Dooley and her decision, but you're also, I think, trying to figure out a way, a practical way, to solve the problem that we've all alluded to, which is send it back or do something to make sure that if they want to amend it, you're fine with it. Yes, of course. Obviously, if they want to do X, Y, and Z, the government, I think, I take it, is fine with that. Yes, exactly, and I want to be clear that right when we first met opposing counsel, they were assigned—I mean, we've always been clear that the way that we read Judge Dooley's decision is it does not prohibit anything. They've always been free to file an amended or new petition. So tell me, Mr. Putnam, just you've heard the questions, I guess. How much time would the government need to figure out how to proceed? And we'll hear from your friend on the other side because he may also have a view on how to resolve what seems to all of us to be a practical problem and to help us avoid some of the more technical, maybe even knottier legal issues. How much time would you need? And just so I'm clear, this is to sort of have conversations and then to attempt to facilitate a settlement of some kind. Maybe you want to hear from your friend on the other side first, but give us a sense of— I don't think we would need much time. I think that really depends on the responsiveness. When we did sort of—and I don't want to overshare any settlement discussions, but just like the broad strokes, our view was really you both are free at any time to just go back to district court, clarify to Judge Dooley we are seeking medical care, and the case will proceed from there. That's something that they weren't interested in. I really can't explain it from their point of view. Maybe they don't like the substance of the— We'll ask a question that was posed to you, which is what does your friend on the other side precisely want? Go ahead. I think we're all set. Okay. Thank you, Your Honors. Counsel, any comments? Judge Cabanas, I'm sorry, did you have any other questions of the government? No, not at all. Thank you very much. Your Honors, we would like nothing more than to be back in front of the district court, but the district court needs to have the right legal framework in front of it. Currently, the district court thinks that it needs to apply the prospective relief provisions at the pleading stage, and that plaintiffs need to guess at what sort of relief might eventually become appropriate on pain of dismissal. That's not how the prospective relief provisions work, and it's not how the federal rules of civil procedure work. For instance, Rule 54C explains that courts must, quote, grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings. So regardless of what my clients sought, that request for relief was not a basis for dismissal. The district court needs to have the full panoply of remedies at its disposal to remedy whatever constitutional violation it includes. You don't need to go back to the district court at all if there is a settlement that stipulates to what kind of treatment these gentlemen are going to get, wherever they happen to be, right? And I assume that it is not beyond the wit of – the collective wit of the Bureau of Prisons General Counsel and the United States Attorney for the District of Connecticut to be able to speak for the government in general and figure out what these folks want in terms of actual treatment. And of course, you know, this is easier said than done, I realize, that they may want different kinds of treatment that in fact wouldn't be medically advisable or whatever, but to find out what it is that needs to be done for these people and get it done. I agree completely, Your Honor. Of course, it's difficult when the BOP insists that the medical care it's been providing all along is perfectly constitutional to take them at their word. But you're not asking for any damages, so it doesn't matter whether they were tortured for five years because you're not asking for any compensation for any of that. What you're asking for is what's going to happen next. And what they are saying is what is happening now is adequate. So let's find out. If you don't think it's adequate, then that's fine. If there's something else that, you know, your medical experts or whatever think is the appropriate treatment and they're not getting it, then we've got a different situation. But I'm just focused on getting these people what they need. And it seems to me that the government seems very open to a settlement that would clear that all up. We are perfectly open to a settlement as well if the settlement will result in constitutional medical care, 100%, Your Honor. Now, there's a little wrinkle, which was introduced by Mr. Putnam. He said that Mr. Bilchin has checked in care. Is that correct? Yes, Your Honor, twice. The first time in July of 2021, the last time just recently. And it's just to get the basal cell carcinoma removed. We understand that's what he needs. That's the recommended treatment. So that's not what my client tells me, Your Honor. What my client tells me is that he was once told that he could have surgery today that would be permanently disfiguring. Oh, sorry. One second. The risk of extending this unnecessarily. Can I ask the presiding judge, my good friend, Judge Laurier, to ask the other speaker, the other lawyer who was far away and spoke apparently some words of significance. You should get a microphone. Yes. Would you repeat what you said, Mr. Putnam? Yes, Your Honors. I'm sorry for speaking off mic. I was trying to point you to a microphone. Our understanding is Michael Milchin has basal cell carcinoma on his face. I believe it's centered around his nose. And the recommended treatment is for it to be removed. This complaint was originally filed in April 2021. We brought him to a surgeon to get it removed in July 2021, and he rejected the treatment. Instead, because he rejected the treatment, they gave him a cream-based treatment. Now, if we fast forward, the cream-based treatment did not work and did not ameliorate the problem, so he was scheduled again to see the surgeon. I believe it was February 12th, but I know it was Super Bowl Sunday this year, 2023. The prison officials tried to bring him physically to go back to the surgeon to get the cancer removed, and he refused, and then he signed a medical refusal form. So I can't speculate as to the intentions. I don't know if it's a litigation tactic, but the Bureau of Prisons has tried to give Michael Milchin adequate medical care. We do think if this case ends up in a district court, in any new or amended 2241 petition, we're certainly going to be filing that forthwith. But those are the facts. That's the state of affairs. Yes. So we'll hear from counsel. So as I was saying, Your Honor, as to Mr. Milchin, Mr. Milchin tells me that he was told one time that he could have the surgery that day, that it would be permanently disfiguring, and that that was his only choice. He asked for a second opinion, which he was told he would have, and nearly a year later, he never got it. So regardless of the fact— All right, so if he gets a second opinion, then what? Then we would proceed from there, Your Honor. I think these are thorny factual questions about exact— So maybe he needs a second opinion, and what we need to find out from that Mr. Pelletier is whether these doctors think he's done with radioactive treatment or needs more radioactive treatment. And these things, again, they are factual issues, but I don't know that they are impossible of resolution, either because the parties come to an agreement about what the facts really are or whether they come to an agreement of a way to determine what the facts really are that would be appropriate. And if that means filing one lawsuit in New Jersey and another in Pennsylvania, but where there are basically stipulated facts or stipulated relief, I'm not sure why that is beyond the wit of everyone to figure out. So why don't we do this, and you tell me how much time you heard from the government, approximately how much time you would need to have a discussion, at least with the government, and get back to us on the progress of these discussions. It's difficult for me to give you a timeframe at this moment, Your Honor. I'd, of course, need to speak with my clients, which itself has been an undertaking, getting calls with them. I would say at least a month or two. A month or two? I don't know exactly, Your Honor. It's taken me a month just to set up a call with Mr. Pelletier. It is very difficult to do that. And the government? What about a month to start with, and then you can report back on progress, if that makes sense? Yes, Your Honor. A month sounds great. I was going to propose three weeks. A month. A month. So if you would get back to us within a month on the progress of your discussions. Is that fair? Yes, Your Honor. Yes? Yes, government? Yes, Your Honor. And maybe the government can figure out a way of making it easier for Mr. Barnett to be able to communicate with these people. Can I just ask one clarifying question? Sure. Because we know Pelletier was moved this morning. I don't know if, you know, my plan was to leave, file a motion. I don't want to provoke things by doing unnecessary litigation practice, but would the court prefer that we continue this briefing or maybe just stay the briefing? And do you need a stay or something or an extension of time to file the reply brief until after that month has passed? Would that help you? That would be one way to do it. We're happy to, I mean, I'm happy to file. If you want us to even see anything more given this discussion, I'll leave it to you. Given this discussion, I think we're fine with you not seeing anything more and getting an extension just until that. So we'll give you, we'll hear from you in a month, and then we'll take it by, we'll play it by ear. Thank you so much, Your Honor. Mr. Bonas? Well, that's fine. I think that's fine. And I was about to make some interim statement suggesting that we may need the help of the marshals here. All right. Very good. Thank you. All right. Thank you very much. Appreciate your time. And that will reserve the decision, obviously. That concludes today's oral argument calendar, and I'll ask the court and deputy to adjourn the court. Thank you, Justice Bonas. Court is adjourned. Thank you.